UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
REGINALD GREENE,                                          :

               Petitioner,                      :          06 Civ. 5532 (LAP) (GWG)

                                      :

   -v.-                                                  :          REPORT AND
                                                                   RECOMMENDATION
WILLIAM BROWN, Superintendent,
Eastern NY Correctional Facility,                        :

               Respondent.                      :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

On March 3, 2003, a jury found petitioner Reginald Greene guilty of Robbery in the First

Degree under New York Penal Law § 160.15(4).  On March 20, 2003, he was sentenced to a

determinate term of 18 years.  Greene is currently an inmate at Eastern NY Correctional Facility

in Napanoch, New York and brings this petition pro se for a writ of habeas corpus pursuant to

28 U.S.C. § 2254.   For the reasons stated below, the petition should be denied.

I.  BACKGROUND

      A.  Trial Testimony

          1.  The Robbery

The trial testimony reflected that Mohammad Iqbal, Shaukat Malik, and Sajjad Ahmad

worked at the Mirage 2000 Jewelry Center in the Bronx.  (Malik: Tr. 553, 555; Ahmad: Tr. 715,

717).[1]  Iqbal was a salesperson, but left the country before the trial to go back to Pakistan.  (See

_____

     [1] "Tr." refers to the proceedings held in this case from February 11, 2003 until March 3,
2003.  The title page of the first volume of the proceedings' transcripts gives the date as
February 10, 2003, but the prosecutor indicates that "tomorrow is Lincoln's birthday," see Tr.
40, which would make the first day February 11th, not February 10th.  Furthermore, the date
                                                        (continued...)

Malik: Tr. 556; Ahmad: Tr. 718).  Malik also worked as a salesperson and had no ownership

interest in the business.  (Malik: Tr. 554).  Ahmad was the store's manager and was the only

employee with the combination to the safe, but also did not have an ownership interest.  (Ahmad:

Tr. 716, 778-79).  The owner, Henry Mahgrefteh, lived in California and ran a jewelry shop in

Beverly Hills.  (Malik: Tr. 569, 652; Ahmad: Tr. 716, 746, 779).

On January 3, 2001, when Malik and Ahmad arrived at the Mirage 2000, the store's

security guard had not yet arrived.  (Malik: Tr. 556-57; Ahmad: Tr. 717-19).  When a security

guard did show up, it was not the regular guard but someone who had worked there a few times

before named William Dunbar, who also went by the name of "Chance."  (Malik: Tr. 559, 633;

Ahmad: Tr. 720-21; Perino: Tr. 926).  Iqbal had also arrived.  (Malik: Tr. 559; Ahmad: Tr. 717,

736).

At 10:00 a.m., Ahmad was in the back of the jewelry store when the buzzer rang from the

locked front door, approximately 45-55 feet away.  (Malik: Tr. 560, 574; Ahmad: Tr. 737, 793).

Ahmad saw someone "with a UPS uniform, [and] a yellow envelope," and buzzed him in.

(Malik: Tr. 574-75; Ahmad: Tr. 737, 747-49).  Malik was about 7-8 feet from the door and had a

clear, unblocked view of the UPS man's face.  (Malik: Tr. 575, 614).  The uniformed man

entered with two others and, after Ahmad saw a gun, he ran into the bathroom.[2]  (Ahmad:  Tr.

---

[1](...continued)
given for the pre-trial suppression hearing is February 11, 2003.  The transcript of that hearing is
referred to as "H. Tr."  Finally, the transcript of the sentencing is referred to as "S."

[2] Malik testified that the UPS man did not have a gun but that the other two perpetrators
did.  (Malik: Tr. 577-78, 643).  Ahmad apparently told the police the same thing (see Tr. 816
(statement of Greene's counsel, Patrick L. Bruno)) and repeated this testimony to the grand jury.
(See Tr. 817-18).  At trial, however, Ahmad testified initially that the UPS man had a gun.

(continued...)

737-38, 750-51).  Malik was soon taken at gunpoint and locked in the bathroom.  (Malik: Tr.

578-80).  A gunman then ushered Iqbal and Ahmad into the bathroom.  (Malik: Tr. 580, 582;

Ahmad: Tr. 738, 751).  Dunbar remained in the store.  (Ahmad: Tr. 829).

    After several minutes (Malik: Tr. 583; Ahmad: Tr. 738), the perpetrator with the gun

came into the bathroom and asked Ahmad to show him the buzzer, which was necessary to exit

the store.  (Malik: Tr. 583-84; Ahmad: Tr. 729, 738, 752, 755-56).  At this point, Ahmad and

Malik did not see the man in the UPS uniform.  (Malik: Tr. 584; Ahmad: Tr. 755).  Ahmad was

then directed to return to the bathroom.  (Ahmad: Tr. 738, 756).  After the perpetrators left,

Dunbar opened the bathroom door to let the three men out (see Malik: Tr. 585; Ahmad: Tr. 738-

39, 757), and then Dunbar left the store.  (Ahmad: Tr. 739, 782).  Dunbar never returned.

(Malik: Tr. 639-40; Ahmad: Tr. 782).

    Ahmad called 911.  The first officer who arrived, Officer Madison, apparently reported

that Ahmad and Malik described the race of the UPS man as white and Hispanic.  (Perino: Tr.

923).  But Detective Perino, a later arriving officer, testified that he was told at the scene that the

UPS man "was a dark skinned male Hispanic black."  (Perino: Tr. 923, 960).  Both Malik and

Ahmad testified that they had described the man to the police as a black Hispanic.  (Malik: Tr.

650-51; Ahmad: Tr. 830).

    Ahmad told the police that he had never seen the UPS-uniformed man before.  (Ahmad:

Tr. 794, 821, 828; Perino: Tr. 925-26).  He also told the grand jury that he had never seen the

---

[2](...continued)
(Ahmad: Tr. 737, 819-20).  On re-direct and re-cross examination, however, Ahmad testified that
he could not remember if the UPS man, by then identified as Greene, had a gun.  (Ahmad: Tr.
848, 856-57).

robbers before.  (Ahmad: Tr. 823, 827-28).  But Ahmad testified at trial that he had seen the UPS

man two weeks before, when he came in for a jewelry cleaning.  (Ahmad: Tr. 744, 788).  Dunbar

was at the store that day as the guard, and Dunbar had introduced the UPS man as "my brother."

(Ahmad: Tr. 744).  Malik testified that he had not seen the UPS man before the robbery.  (Malik:

Tr. 630).

In addition, a store security camera recorded the robbery.  (Malik: Tr. 605, 610; Ahmad:

Tr. 765-72).  A technician made stills from the videotape which showed the UPS man and were

admitted as exhibits.  (Castro: Tr. 692-93; Perino: Tr. 882-84).  In summation, the People argued

that one of the stills showed either Greene or his "evil identical twin brother."  (Tr. 1022).

2.  The Identification

For reasons that were explained outside the presence of the jury at a pre-trial hearing, the

police's investigation focused on Greene.  On February 2, 2001, Perino went to Greene's house

at approximately 6:30 a.m. to arrest him.  (Perino: Tr. 890-91, 934).  Greene was placed in a

holding cell.  (Perino: Tr. 894).  Meanwhile, Perino went to pick up Malik and Ahmad.  (Malik:

Tr. 625-26, 659; Ahmad: Tr. 774-75; Perino: Tr. 894).  After the store closed, at about 7:30 p.m.,

Perino took them to see a lineup.  (Malik: Tr. 662).  Malik and Ahmad both chose Greene from

the lineup.  (Malik: Tr. 627; Ahmad: Tr. 776-77).

Greene did not offer any evidence.

B.  Verdict and Sentence

Following deliberations, on March 3, 2003, the jury found Greene guilty of Robbery in

the First Degree.  (Tr. 1107).  On March 20, 2003, Greene was sentenced to a determinate term

of 18 years imprisonment.  (S. 14).

4

C.  Testimony at the Suppression Hearing Regarding the Photo Array

As was reflected at a pre-trial suppression hearing, on the day of the robbery, Malik and Ahmad came to the police station, where they viewed a "PIMS photo machine," which is "a computerized version of mug shots."  (Perino: H. Tr. 40).  They "look[ed] at both male blacks and male Hispanics and dark-skinned Hispanics."  (Perino: H. Tr. 41).  Greene's photo was not in the system.  (Perino: H. Tr. 40).

Perino later obtained Greene's photograph by e-mail from the Department of Motor Vehicles ("DMV").  (Perino: H. Tr. 20).[3]  Perino then scanned some mug shots ("so they would all appear to have the same color tone" as the e-mailed photograph) and created "a photo array." (Perino: H. Tr. 22).  On February 1, 2001 he brought the photo array to the jewelry store and showed it to Ahmad and Malik separately.  (Perino: H. Tr. 25-27, 37).  Each chose Greene's photograph.  (Perino: H. Tr. 26-27).  Perino thereafter arrested Greene and held the lineup.

D.  Direct State Court Appeals

Greene, through counsel, appealed his conviction to the Appellate Division, First Department.  See Brief for Defendant-Appellant ("Pet. App. Mem.") (reproduced as Ex. 1 to Affidavit in Opposition, filed Dec. 14, 2006 (Docket #6) ("Resp. Aff.")).  Counsel argued that (1) the verdict was against the weight of the evidence, see id. at 21-30; (2) Greene's due process rights were violated by the trial court's barring his counsel from inquiring into the complainants' motive for identifying him, see id. at 31-36; and (3) his sentence was excessive.  See id. at 36-38. In a supplemental pro se brief, Greene argued that (1) he received ineffective assistance of

---

[3]Although the reason Perino focused on Greene does not appear in the hearing transcript, Perino's testimony at trial, to which an objection was sustained, reveals that it was based on an anonymous phone call.  (Perino: Tr. 886).

counsel, see Supplemental Pro-Se Brief (reproduced as Ex. 2 to Resp. Aff.) ("Supp. App.

Mem."), at 15-28; (2) his due process rights were violated by (a) certain statements made by the

court regarding September 11th at voir dire, (b) the court's "delegation of judicial tasks to non-

judicial personnel," (c) the court's failure to assign new counsel, and (d) the court's "failure to

. . . properly follow the law with regards to allowing a defendant to proceed pro se," see id. at

29-43; and (3) his right to a fair trial was deprived by certain statements made by the prosecutor

during voir dire and summation.  See id. at 44-50.

On March 31, 2005, the Appellate Division, First Department affirmed his conviction.

See People v. Greene, 16 A.D.3d 350 (1st Dep't 2005).  The court ruled that "[t]he verdict was

not against the weight of the evidence"; that the court properly barred the line of questioning

regarding the victims' motive; and that there was "no basis for reducing the sentence."  See id.

The Appellate Division also ruled that the ineffective assistance claim relied primarily on

matters outside the record and needed to be presented in a N.Y.C.P.L. § 440.10 motion.  See id.

Based on the record, Greene "received effective assistance," and "the court properly denied

[Greene's] request for new counsel."  Id.  As for Greene's other claims, the Appellate Division

found them to be unpreserved, but indicated that even if reviewed, they would have been

rejected.  Id.

Greene, through counsel, applied to the New York Court of Appeals for leave to appeal

all of the claims he raised at the Appellate Division.  See Resp. Aff. ¶ 6.  On July 5, 2005, leave

to appeal was denied.  See People v. Greene, 5 N.Y.3d 789 (2005).

E.  The Present Petition

Greene's petition is dated June 30, 2006; was received by the Pro Se Office on July 6,

2006; and was docketed on July 21, 2006 (Docket #1) ("Petition").  The Petition seeks a writ of habeas corpus based on the following grounds:

(1) The verdict was against the weight of the evidence and the evidence was insufficient. Petition at 3.

(2) The trial court violated Greene's rights by prohibiting him from presenting a defense that the complainants falsely identified him for an ulterior motive.  Id. at 4.

(3) Greene's counsel rendered ineffective assistance by (a) improperly presenting facts for pre-trial suppression hearings; (b) failing to call a witness who could corroborate Greene's innocence; and (c) failing to resubmit a request for a missing witness charge.  Id.

(4) The trial court's statements during voir dire, the "delegati[on] of judicial duties to non-judicial person[nel]," the failure to assign new counsel, and the "failure . . . to properly administer the statutory requirements for [Greene] to proceed pro-se" denied his rights to due process and a fair trial under the Sixth and Fourteenth Amendments.  Id.

(5) The prosecution's statements during voir dire and at summation deprived Greene of a fair trial.  Id.

## II.  LAW GOVERNING REVIEW OF CLAIMS IN HABEAS CORPUS PETITIONS

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in the state courts unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For a claim to be adjudicated "on the merits" within the meaning of 28 U.S.C. § 2254(d), it must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered to be "adjudicated on the merits" even if it fails to mention the federal claim and no relevant federal case law is cited. See Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001) (internal quotation marks omitted); accord Rosa v. McCray, 396 F.3d 210, 220 (2d Cir.) ("This standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether the court has alluded to federal law in its decision."), cert. denied, 126 S. Ct. 215 (2005). Moreover, a state court's determination of a factual issue is "presumed to be correct" and that presumption may be rebutted only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In Williams v. Taylor, the Supreme Court held that a state court decision is "'contrary to'" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. 529 U.S. 362, 405-06 (2000). Williams also held that habeas relief is available under the "'unreasonable application'" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court

decision applied clearly established federal law erroneously or incorrectly." Id. at 411.  Rather, the state court's application must have been "objectively unreasonable." Id. at 409.

In addition, under 28 U.S.C. § 2254(a), federal habeas review is available for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  Errors of state law are not subject to federal habeas review.  See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  To be entitled to habeas relief a petitioner must demonstrate that the conviction resulted from a state court decision that violated federal law.  See, e.g., id. at 68.

III.  DISCUSSION

    A.  Weight and Sufficiency of the Evidence

        1.  Weight of the Evidence

Greene argues that his conviction was against the weight of the credible evidence. Petition at 3; see also Pet. App. Mem. at 21-30.  A claim regarding the "weight" of the evidence, however, is not cognizable on federal habeas review because it is purely a state law claim that does not present a federal constitutional issue.  See, e.g., Norman v. Brown, 2007 WL 519242, at *4 (S.D.N.Y. Feb. 16, 2007) ("There is no federal right to challenge a verdict as against the weight of the evidence . . . ."); Wilson v. Senkowski, 2003 WL 21031975, at *8 (S.D.N.Y. May 7, 2003) (Report and Recommendation) (citing cases), adopted by, Order, filed May 29, 2003 (Docket #20 in 02 Civ. 231); Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001); Kearse v. Artuz, 2000 WL 1253205, at *1 (S.D.N.Y. Sept. 5, 2000); see also Young v. Kemp, 760 F.2d 1097, 1105 (11th Cir. 1985) ("A federal habeas court has no power to grant habeas

corpus relief because it finds that the state conviction is against the 'weight' of the evidence
. . . ."), cert. denied, 476 U.S. 1123 (1986).  Accordingly, this claim must be rejected.

2.  Sufficiency of the Evidence

Greene claims that the evidence adduced at trial was legally insufficient because the
victims were too distant from the UPS man, the viewing took place in a chaotic environment,
and the description originally given by the victims did not resemble Greene.  Petition at 3.
While the respondent argues that this claim is unexhausted, see Memorandum of Law (attached
to Resp. Aff.) ("Resp. Mem."), at 3, it is unnecessary to reach this question because a federal
habeas court has the power to deny an unexhausted habeas claim on the merits.  See 28 U.S.C. §
2254(b)(2); Aparicio, 269 F.3d at 90 n.5.

In contrast to Greene's weight of the evidence argument, his insufficiency of the
evidence argument is cognizable under the Due Process Clause of the Fourteenth Amendment,
which prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every
fact necessary to constitute the crime."  In re Winship, 397 U.S. 358, 364 (1970).  In light of
Winship, the Supreme Court has held that when reviewing a state court conviction, a federal
habeas court must consider whether there was "sufficient evidence to justify a rational trier of
the facts to find guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 313
(1979).

Nonetheless, a habeas petitioner challenging the sufficiency of the evidence underlying
his conviction bears a "very heavy burden."  Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir.)
(internal quotation marks and citation omitted), cert. denied, 515 U.S. 1136 (1995).  To prevail,
the petitioner must show that "upon the record evidence adduced at the trial no rational trier of

10

fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324;

accord Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002).  In conducting this inquiry, all of

the evidence and all reasonable inferences that may be drawn from the evidence are to be

considered in the light most favorable to the prosecution.  Jackson, 443 U.S. at 319; accord

Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996).  Furthermore, "assessments of the weight of

the evidence or the credibility of witnesses are for the jury" and thus a habeas court must "defer

to the jury's assessments of both of these issues."  Maldonado, 86 F.3d at 35; accord Rosa v.

Herbert, 277 F. Supp. 2d 342, 347 (S.D.N.Y. 2003) ("the court must defer to the jury's

assessments of the weight of evidence and the credibility of witnesses") (citation omitted);

Fagon v. Bara, 717 F. Supp. 976, 979 (E.D.N.Y. 1989) ("[T]his court is not free to make

credibility judgments about the testimony presented at . . . trial or to weigh conflicting

testimony.") (citing cases).

  As reflected in his brief on appeal, Greene's arguments regarding the evidence in his case

center on the alleged weakness of the identifications by Malik and Ahmad.  See Pet. App. Mem.

at 21-30.  Greene makes various arguments as to why the witnesses' identifications should not

have been credited.  However, this Court must defer to the jury's "assessments of the weight of

the evidence or the credibility of witnesses."  Maldonado, 86 F.3d at 35.  "'Federal habeas courts

are not free to reassess the fact specific credibility judgments by juries or to weigh conflicting

testimony.  On collateral review this Court must presume that the jury resolved any questions of

credibility in favor of the prosecution.'"  Rosario v. Walsh, 2006 WL 1431410, at *20 (S.D.N.Y.

May 25, 2006) (quoting Vera v. Hanslmaier, 928 F. Supp. 278, 284 (S.D.N.Y. 1996)).

Here, Malik and Ahmad made unequivocal identifications of Greene, and it is well settled that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." United States v. Danzey, 594 F.2d 905, 916 (2d Cir.) (citations omitted), cert. denied, 441 U.S. 951 (1979); see also Tibbs v. Florida, 457 U.S. 31, 45 n.21 (1982) ("In this case, [the victim] provided eyewitness testimony to the crimes. If the jury believed her story, the State's presentation was more than sufficient to satisfy due process."); Edwards v. Jones, 720 F.2d 751, 755 (2d Cir. 1983) ("[W]hile [the sole eyewitness's] testimony and character were less than inspiring," his testimony was nevertheless sufficient to support a conviction due in part to the fact that the jury had the opportunity to evaluate the credibility of the witness); Manning v. Walker, 2001 WL 25637, at *5-6 (E.D.N.Y. Jan. 3, 2001) (habeas court will not reevaluate jury's choice to credit eyewitness's testimony notwithstanding alleged inconsistencies). Thus, this claim fails as well.

B. Cross-Examination on Motive

Greene's counsel had sought to inquire into Malik's and Ahmad's motive for identifying him, which Greene asserts was "for a[] higher insurance profit." See Petition at 4. The trial court prohibited this line of cross-examination and Greene argues that this violated his right to "present a defense, and to confront and cross-examine his accusers" under the Sixth and Fourteenth Amendments. Id.

1. Background

According to Greene's counsel, the Mirage 2000 Jewelry Center had an insurance policy with a $5,000 deductible; but, under the policy, if an armed guard was not present, there was an

12

additional $250,000 deductible.  See Tr. 433-34.  In the robbery, the jewelry store lost

merchandise valued at $400,000.  Tr. 433.

Following the robbery, an air pistol or B.B. gun was recovered at the scene.  (Perino: Tr.

865, 868-69).  The defense counsel elicited from Detective Perino on cross-examination that

Dunbar, the temporary guard, had told Detective Perino that this gun might have been his.

(Perino: Tr. 927-28).

Prior to trial, Greene's counsel argued that the potentially lost insurance money gave

Malik and Ahmad a motive to have Dunbar disappear and "a motive to identify anyone who was

apprehended."  See Tr. 435.  Once someone was arrested, Malik and Ahmad could attribute the

recovered B.B. gun to the robber in lieu of Dunbar.  See Tr. 438-39.  This would protect the

owner's financial interests and, it was suggested, possibly Malik's and Ahmad's too.  See Tr.

434-37.

Defense counsel sought to ask Malik and Ahmad whether "they were aware of the

requirements of the insurance policy; whether they had, in fact, inspected or inquired about

whether the guard was armed; and whether they, in fact, knew that on that occasion the guard,

Dunbar, had [the B.B. gun]."  (Tr. 476).   In deciding not to permit the line of inquiry, the trial

judge stated as follows:

> This Court is wholly unpersuaded by this claim.  If the complainants were
> actually motivated by a desire to cover up their own failures, cooperating with the
> police and identifying one of the robbers would simply be out of the question.
> Identifying any person would bring . . . precisely the scrutiny which counsel
> argues that they were seeking to avoid.  A simple assertion that the complainants
> had a motive to lie does not make it so.

(Tr. 517).  Thus, the trial court precluded the introduction of the insurance policy (Tr. 519) and

evidence of the B.B. gun (Tr. 518-19).  However, the trial court permitted Greene "to ask the

13

complainants whether they had told anyone, including representatives of [the insurance company], whether there was an armed guard on duty in the store on the day of the robbery." (Tr. 519). The trial court also permitted the defendant to ask the police what was recovered at the scene of the crime, including whether the gun was recovered. (Tr. 522). In light of this ruling, the prosecution withdrew its objection to the introduction of the B.B. gun. (Tr. 526).

Greene raised this issue on direct appeal. See Pet. App. Mem. at 31-36. The Appellate Division ruled that "[t]he court . . . properly exercised its discretion in precluding inquiry into a matter that was utterly irrelevant to any issue presented at trial." Greene, 16 A.D.3d at 350 (citation omitted).

> ## 2. Applicable Law

The Supreme Court has stated that

> [t]he Confrontation Clause of the Sixth Amendment guarantees the right of an
> accused in a criminal prosecution to be confronted with the witnesses against him
> . . . [T]he main and essential purpose of confrontation is to secure for the
> opponent the opportunity of cross-examination. . . . Of particular relevance here,
> [w]e have recognized that the exposure of a witness' motivation in testifying is a
> proper and important function of the constitutionally-protected right of
> cross-examination.

Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986) (citations, emphasis and internal quotation marks omitted). A violation of the Confrontation Clause occurs when a defendant is "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" Id. at 680 (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)).

14

The right to cross-examination under the Confrontation Clause is not absolute, however. "[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about . . . harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. at 679.  Nonetheless, a restriction on the right to confront an adverse witness may be unconstitutional if it is "'arbitrary or disproportionate to the purposes [the restriction is] designed to serve.'" Michigan v. Lucas, 500 U.S. 145, 151 (1991) (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)).

Defendants have a related right to "a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986).  But "[w]hile a defendant has the right to present a complete defense, that right is not without limits and 'may[,] in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" Hawkins v. Costello, 460 F.3d 238, 243 (2d Cir. 2006) (quoting Chambers v. Mississippi, 410 U.S. 284, 295 (1973)), cert. denied, 127 S. Ct. 1267 (2007).  As an example of a limitation, a defendant "'does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" Id. (quoting Taylor v. Illinois, 484 U.S. 400, 410 (1998)).

3. <u>Discussion</u>

"In considering whether the exclusion of evidence violated a criminal defendant's right to present a complete defense, we start with 'the propriety of the trial court's evidentiary ruling.'" Id. at 244 (quoting Wade v. Mantello, 333 F.3d 51, 59 (2d Cir. 2003)).  Here, the trial judge's decision to limit questioning was within the bounds of New York law, which permits reasonable limits on questioning.  See, e.g., People v. Ventura, 298 A.D.2d 172, 173 (1st Dep't 2002)

("[The court] properly exercised its discretion in imposing reasonable limits on cross-examination by precluding matters beyond the scope of the direct testimony and collateral to the subject of the hearing."); People v. Calle, 280 A.D.2d 371, 371 (1st Dep't 2001) ("The court properly exercised its discretion by imposing reasonable limits upon defendant's cross-examination of [the witness] as to collateral issues . . . . ").

As the Appellate Division concluded, the trial court acted properly in excluding this evidence. If Malik and Ahmad had wanted to explain the air gun, they could have simply said it had been left by the robbers. They did not need someone to be arrested before they could make such a statement. Indeed, falsely identifying someone as the perpetrator could only have complicated their efforts because the arrestee could deny ownership of the gun.

Where, as here, the "trial court has not made a state evidentiary error, we must consider whether the evidentiary rule the court applied is arbitrary or disproportionate to the purposes it is designed to serve, and we can only find the rule arbitrary or disproportionate if it infringes on a 'weighty interest of the accused.'" Hawkins, 460 F.3d at 245 (quoting United States v. Scheffer, 523 U.S. 303, 308 (1998)). Given the fact that testimony about the witnesses' knowledge of the insurance requirements was collateral to the suit and given that the witnesses' responses to these questions would do little or nothing to show their bias, there was nothing "arbitrary or disproportionate" about the trial court's ruling.

For the same reason, Greene's Confrontation Clause claim must fail inasmuch as the trial judge properly exercised his "wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about . . . interrogation that is . . . only marginally relevant." Delaware, 475 U.S. at 679.

16

C.  Ineffective Assistance of Counsel

To show ineffective assistance of counsel, a petitioner must satisfy both prongs of the two-part test articulated in Strickland v. Washington, 466 U.S. 668, 687-96 (1984).  The Strickland test has been characterized as "rigorous" and "highly demanding."  Pavel v. Hollins, 261 F.3d 210, 216 (2d Cir. 2001) (internal quotation marks and citations omitted).  To meet Strickland, a petitioner must show (1) "that counsel's representation fell below an objective standard of reasonableness;" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 688, 694; accord Rompilla v. Beard, 545 U.S. 374, 380 (2005); Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003).  In evaluating the first prong – whether counsel's performance fell below an objective standard of reasonableness – "judicial scrutiny . . . must be highly deferential" and the petitioner must overcome the "presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  Bell v. Cone, 535 U.S. 685, 698 (2002) (alteration in original) (internal quotation marks omitted) (quoting Strickland, 466 U.S. at 689).

Greene argues that his trial counsel rendered ineffective assistance because he failed to (1) "provide facts necessary that would have granted a combined Darden / Crews / Mapp / Dunaway / Wade hearing where petitioner's arrest and pre-trial identifications of him would have been suppressed"; (2) call Dunbar as a witness, who allegedly would have corroborated Greene's innocence; and (3) "re-submit [a] request for a missing witness charge."  Petition at 4. In the Appellate Division, Greene had also argued that his attorney had not properly consulted with him – a claim he has not raised in the instant petition.  It appears that this was the basis for

17

the Appellate Division's ruling that Greene's "ineffective assistance of counsel claim primarily involves matters outside the record and thus would require a [N.Y.]C.P.L. 440.10 motion." Greene, 16 A.D.3d at 350.  It further ruled that "[t]he present record establishes that [Greene] received effective assistance."  Id.

    We now discuss each of the claims regarding ineffective assistance of counsel.

    1. Pre-trial Hearings

        a. Mapp

    In his pro se brief to the Appellate Division, Greene argued that the DMV photo was illegally seized and used in the violation of his Fourth Amendment privacy rights and thus that his counsel was ineffective for failing to challenge its admission.  See Supp. App. Mem. at 18-20.

    While Greene's contention that his DMV photograph was illegally seized and used could not stand as an independent basis for habeas relief, see Stone v. Powell, 428 U.S. 465 (1976), this Court can consider Greene's claim that his counsel was ineffective because of his failure to seek suppression.  See, e.g., Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006).  Where a petitioner's "ineffective assistance claim is based on counsel's failure to raise Fourth Amendment issues, he must also show 'that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence.'"  Id. (quoting Kimmelman v. Morrison, 477 U.S. 365, 375 (1986)).

    Evidence obtained from an unlawful search or seizure is generally subject to exclusion as "fruit of the poisonous tree."  See Wong Sun v. United States, 371 U.S. 471, 484-85, 488 (1963). The DMV photograph itself was not admitted into evidence at the trial, however.  Nor was

18

evidence of the photo array.  Thus, Greene's argument presumably turns on the proposition that

his counsel should have sought suppression of his lineup identification based on the argument

that Greene was unlawfully in custody of the police when the lineup was arranged because the

lineup followed from the allegedly improper use of the photograph as part of the photo array.

But, while New York provides that "any photo image taken . . . for a . . . driver's license shall

not be a public record," N.Y. Veh. & Traf. Law § 504(3), "a violation of a statute may be

remedied by suppression only if the purpose of the statute is to give effect to a constitutional

right."  People v. Temel Greene, 36 A.D.3d 219, 227-28 (1st Dep't 2006) (no suppression

available for medical information disclosed by hospital inasmuch as "physician-patient privilege

is not one of constitutional magnitude").  The Court is unaware of any constitutionally-based

purpose of section 504(3) and thus it does not appear that there would have been any method to

obtain suppression based on the improper use of the photograph.  Accordingly, Greene's counsel

did not act unreasonably in not seeking suppression of the lineup.

> b.  Request for Darden/Crews Hearing.

Prior to trial, Greene's second attorney, identified as "Mr. Kelly," filed an "omnibus

motion" requesting pre-trial relief.  See Supp. App. Mem. at 4; Resp. Mem. at 15.  On May 4,

2001, the court granted a hearing pursuant to United States v. Wade, 388 U.S. 218 (1967) and

gave Kelly "21 days to supply the factual information needed to support granting a hearing based

on the case law in [United States v. ]Crews [445 U.S. 463 (1980)]."  Supp. App. Mem. at 4;

accord Resp. Mem. at 15.  Kelly, a retained attorney, was later replaced by an appointed

attorney, identified as "Mr. Ventura," who was later replaced by another appointed attorney,

Bruno, who became Greene's trial counsel.  See Supp. App. Mem. at 5, 33-34.  No supplemental

factual information was submitted and a Crews hearing was not held.  See Supp. App. Mem. at 4; Resp. Mem. at 15.  A pre-trial suppression hearing as to the lineup, however, was held on February 11, 2003.  (H. Tr. 1).

Greene argued that effective counsel would have supplied the facts necessary to grant a Darden / Crews hearing.  See Supp. App. Mem. at 20.  Greene asserts that "[a] Darden / Crews hearing was the appropriate venue to challenge the inclusion of the . . . DMV photo," as well as "to challenge the reliability of the informant's information" that led to the DMV photo.  See id. at 18, 20.

Greene has not shown, however, that Crews has any applicability to this case.  In Crews, the Supreme Court held that an in-court identification might be subject to suppression under certain circumstances if a defendant was wrongfully in custody at the time of a lineup.  445 U.S. at 471-72.  Here, as just discussed, there was no basis for arguing that Greene was not in lawful custody at the time of his lineup.

With respect to Darden, the New York Court of Appeals held in People v. Darden, 34 N.Y.2d 177 (1974), that where "there is insufficient evidence to establish probable cause apart from the testimony of the arresting officer as to communications received from an informer," the trial court must conduct an in camera hearing with the informant.  Id. at 181.  "The purpose of such a hearing is to verify (1) the existence of the informant; (2) the nature of the communications between the informant and the police officer; and (3) the reliability of the informant's information."  Thomas v. Fischer, 2004 WL 725636, at *5 (S.D.N.Y. Apr. 5, 2004) (internal citations omitted).

Darden is irrelevant here because the photograph was not obtained by means of a search or a seizure for which probable cause was required.  Therefore, it was reasonable for Greene's counsel not to seek to suppress the introduction of the photo on the basis of the informant not meeting the test set forth in Darden.

### c.  Delay and Request for Counsel

Greene was arrested at approximately 6:30 a.m.  See Perino: Tr. 891.  In his appellate brief, he contended that he requested, but was denied, counsel and was not put in the lineup until 8:30 p.m.  See Supp. App. Mem. at 21.  He construed these events as "the police purposely delay[ing]" the indictment in order to conduct the lineup without counsel.  See id.  He argued that this violated his "right to due process and a fair trial."  Id.  Because his counsel did not challenge these events, he argues that he received ineffective assistance of counsel.  See id. at 21-22 (citing N.Y.C.P.L. § 140.20(1)).

The respondent provides two reasons for the delay between arrest and the lineup: (1) Perino believed that Malik and Ahmad could not leave the jewelry store until it closed, see Perino: H. Tr. 25; and (2) "the police had not completed its investigation."  See Resp. Mem. at 17.  The respondent also asserts that Greene's request for counsel was properly denied because his right to counsel had not yet attached.  Id.

This claim also provides no basis for habeas relief.  First, Greene would not have had a valid argument based on the delay alone.  New York law requires that an arraignment occur "without unnecessary delay."  N.Y.C.P.L. § 140.20(1).  But it appears that the only enforcement mechanism available for this statute is to require an inmate's release prior to the arraignment "unless an acceptable explanation for the delay is given."  See People ex rel. Maxian v. Brown,

77 N.Y.2d 422, 424 (1991).  Thus, New York State law does not provide that a delay in

arraignment means that the defendant may not be subsequently indicted and prosecuted.

Accordingly, it would have been pointless for Greene's counsel to have made a post-arraignment

motion challenging the delay in arraignment.

To the extent Greene is arguing that counsel should have sought to suppress his

identification based on the delay, counsel could have properly chosen to forgo this argument

given that a delay in arraignment can be justified by an appropriate police investigation,

including lineups.  See, e.g., People v. Haywood, 280 A.D.2d 282, 282 (1st Dep't 2001); People

v. Jones, 224 A.D.2d 334, 335 (1st Dep't 1996); accord People v. Ramos, 99 N.Y.2d 27, 37

(2002) ("a delay in arraignment for the purpose of further police questioning does not establish a

deprivation of the State constitutional right to counsel.").  Here, the police did not hold the

lineup until after Ahmad and Malik could leave work.  See Perino: H. Tr. 25.  Although the

record does not indicate when the arraignment was held, Greene does not complain about any

additional delay. Because there was nothing improper about the timing of Greene's arraignment,

it was not objectively unreasonable for his attorney not to raise the issue before the trial court.[4]

### d.  Unduly Suggestive Identification Procedures

Greene contended his counsel should have argued that Malik and Ahmad identified him

at the lineup on the basis of the photo array, not the robbery, "because [Greene] was the only

person depicted in both identification procedures."  See Supp. App. Mem. at 23.  He contended

---

[4]Nor was counsel ineffective in failing to make a motion with respect to the denial of
counsel at the lineup.  Under both the federal and New York state constitutions, the right to
counsel does not attach "at lineups conducted before the commencement of formal adversarial
proceedings against a defendant."  People v. Hawkins, 55 N.Y.2d 474, 480, 487, cert. denied,
459 U.S. 846 (1982); accord Kirby v. Illinois, 406 U.S. 682, 690 (1972).

that an independent identification was especially unlikely given his allegations regarding confusion about his race.  See id.

The implicit theory Greene advances is that any choice of an incorrect photograph at the photo array would necessarily have had an effect on the later identification by the eyewitnesses at the lineup.  While this phenomenon has been shown to have scientific merit, see generally Jennifer L. Overbeck, Note, Beyond Admissibility: A Practical Look at the Use of Eyewitness Expert Testimony in the Federal Courts, 80 N.Y.U. L. Rev. 1895, 1902 n.37 (citing authorities), it is not one the law has recognized to date.  See, e.g., Green v. Connell, 2006 WL 3388656, at *8 (E.D.N.Y. Nov. 21, 2006) ("[W]here, as here, the prior photo procedures were in no way suggestive, the inclusion of the same suspect in a subsequent line-up does not render the procedures unduly suggestive or somehow tainted.").  Therefore, Greene's counsel did not act in an objectively unreasonably manner for having failed to raise it.

### 2.  Failure to Call Dunbar as a Witness

Greene argued that his counsel was deficient because he failed to call Dunbar, the temporary security guard, as a witness.  See Supp. App. Mem. at 24-26.  Greene contended that Dunbar was a material witness because he was "in close proximity to the suspects during the robbery," see id. at 25; see also Malik: Tr. 582, 585; Ahmad: Tr. 829; because he told Perino that he could identify the UPS-uniformed perpetrator, see Supp. App. Mem. at 24; see also Perino: Tr. 966 ("probably" or "may" have been able to identify him); and because he was present when the UPS-uniformed perpetrator's jewelry was cleaned and had introduced him as his "brother." See Supp. App. Mem. at 24; see also Ahmad: Tr. 744-45.

23

Although Perino interviewed Dunbar by telephone and in person shortly after the robbery, see Perino: Tr. 954-56, 965, by the time of trial, he could not be located.  See Tr. 330-31.  The trial court offered an investigator to the defense, see Tr. 331, who located Dunbar.  See Tr. 705.  The trial court then authorized a subpoena to bring Dunbar to testify, see Tr. 705, but the defense chose not to call him as a witness.  In his brief to the Appellate Division, Greene argued that Dunbar would have convinced the jury that Greene was indeed not his brother, as Dunbar had stated to Ahmad prior to the robbery; that Greene had not had his jewelry cleaned; and that he was not the robber.  See Supp. App. Mem. at 25.  Finally, Greene maintained that the prosecution's not calling of Dunbar, an eyewitness to the robbery, shows that he would have aided the defense's case.  Id. at 26.  Therefore, Greene argued that his counsel's failure to call Dunbar denied him effective assistance of counsel.

It is well settled that the "decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."  United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.), cert. denied, 484 U.S. 957 (1987), cert. denied, 484 U.S. 958 (1987), cert. denied, 484 U.S. 1061 (1988); accord United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992), cert. denied, 507 U.S. 998 (1993), 507 U.S. 1029 (1993).  Thus, the "failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."  United States v. Eyman, 313 F.3d 741, 743 (2d Cir. 2002) (per curiam) (citations omitted), cert. denied, 538 U.S. 1021 (2003); accord Nersesian, 824 F.2d at 1321 (the decision not to call witnesses "fall[s] squarely within the ambit of trial strategy, and, if reasonably made, will not constitute a basis for an ineffective assistance claim").

While the choice of whether or not to call a particular witness is a strategic choice that is "virtually unchallengeable," counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 690-91. Thus, although "counsel's decision as to whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation," United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (internal quotation marks and citations omitted), cert. denied, 532 U.S. 1007 (2001), an attorney's failure to present available exculpatory evidence may be deficient "'unless some cogent tactical or other consideration justified it.'" Pavel, 261 F.3d at 220 (quoting Griffin v. Warden, 970 F.2d 1355, 1358 (4th Cir. 1992)); accord Eze v. Senkowski, 321 F.3d 110, 133 (2d Cir. 2003).

To succeed on his claim, Greene must show that there is "a reasonable probability" that the result of his trial "would have been different" had Dunbar been served with a subpoena or material witness warrant. Strickland, 466 U.S. at 694. Greene has not made that showing here. In the context of an uncalled witness, courts have held that, "[t]o affirmatively prove prejudice, a petitioner ordinarily must show not only that the testimony of uncalled witnesses would have been favorable, but also that those witnesses would have testified at trial." Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990) (emphasis added) (citing Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985)); accord Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002); Stewart v. Nix, 31 F.3d 741, 744 (8th Cir. 1994); Croney v. Scully, 1988 WL 69766, at *2 (E.D.N.Y. June 13, 1988); see also Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir. 1981) (denying ineffective assistance claim where petitioner did not offer "any facts to support his allegation that [the witness] would have testified at all even if called"). Greene never offered any evidence that

Dunbar would have testified at trial had he been called upon to do so – either in the state courts or in this Court.  Thus, in the absence of evidence that Dunbar would have been willing to waive any Fifth Amendment privilege and testify, Greene cannot show that he was prejudiced by his counsel's failure to issue a subpoena or a material witness warrant.

### 3.  Missing Witness Charge

Under New York law, "[u]nder certain circumstances, the failure of a party to produce at trial a witness who presumably has evidence that would 'elucidate the [events],' requires a trial court . . . to instruct the jury that an unfavorable inference may be drawn from the failure of the party to call such witness."  People v. Gonzalez, 68 N.Y.2d 424, 427 (1986).  The party seeking a missing witness charge must demonstrate "the uncalled witness is knowledgeable about a material issue upon which evidence is already in the case; that the witness would naturally be expected to provide noncumulative testimony favorable to the party who has not called him, and that the witness is available to such party."  Id. (citations omitted); accord People v. Kitching, 78 N.Y.2d 532, 536-37 (1991).

Towards the end of voir dire, Greene's counsel stated that he would "likely . . . be requesting a missing witness charge" for Dunbar's absence.  See Tr. 324.  The judge ruled that he would not give the charge because Dunbar was not "under the control of the" prosecution.  See Tr. 331-32.  Greene argued that once his counsel's investigator did locate Dunbar, see Tr. 705, "it was demonstrated that the people also had access to Mr. Dunbar, but failed to produce him."  See Supp. App. Mem. at 26.  Therefore, he claimed, his counsel was ineffective in not resubmitting the request for a missing witness charge.  See id.

Counsel cannot be faulted for failing to make this request inasmuch as the availability, or "control," element was not met here. "Where there is 'a relationship, in legal status or on the facts, as to make it natural to expect the party to have called the witness to testify in his favor,' the so-called control element is satisfied." People v. Savinon, 100 N.Y.2d 192, 200 (2003) (quoting Gonzalez, 68 N.Y.2d at 429) (control element met where defendant and the witness "had been friends and business associates" and were very "bonded" with each other). In a recent case, the Appellate Division First Department found that

> one of the two private security guards present during the [robbery] . . . was not under the People's control for purposes of a missing witness charge, since there was no reason to expect him to provide testimony favorable to the People. He was no longer an employee of the store from which the goods were stolen, he had no connection with law enforcement, and his former status as a security guard did not create any relationship with the prosecution amounting to control.

People v. Broadhead, 36 A.D.3d 423, 424 (1st Dep't 2007). In the instant case, there was no relationship between the prosecution and Dunbar that would suggest he was under the control of the prosecution. Accordingly, counsel had no basis on which to seek a missing witness charge.

### 4. Ineffective Assistance Summary

The Appellate Division decided that, based on the record, Greene received effective assistance of counsel. See Greene, 16 A.D.3d at 350. For the reasons given above, it cannot be said that this decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), and thus habeas relief is not warranted.

### D. Failure to Assign New Counsel

Greene argues that the trial court abused its discretion in refusing to appoint new counsel for him. See Petition at 4. This claim was raised as a violation of the Fifth, Sixth, and

27

Fourteenth Amendments on direct appeal, see Supp. App. Mem. at 29-37, and the Appellate

Division adjudicated it on the merits.  See Greene, 16 A.D.3d at 350 ("[T]he court properly

denied defendant's request for new counsel.").

Unlike the right to counsel, the right to counsel of one's choice is not absolute.  The

Supreme Court has held that "the right to counsel of choice does not extend to defendants who

require counsel to be appointed for them."  United States v. Gonzalez-Lopez, 126 S. Ct. 2557,

2565 (2006); accord Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624 (1989)

("The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate

representation, but those who do not have the means to hire their own lawyers have no

cognizable complaint so long as they are adequately represented by attorneys appointed by the

courts.").  As one court has noted:

> Although the Sixth Amendment guarantees assistance of counsel, the Supreme
> Court has held that it does not guarantee an absolute right to the counsel of one's
> choosing even for those with retained counsel, see [Wheat v. United States, 486
> U.S. 153, 160 (1988)], a "meaningful" attorney-client relationship, see Morris v.
> Slappy, 461 U.S. 1, 12-15 (1983), or complete satisfaction with counsel's
> performance, see United States v. Cronic, 466 U.S. 648, 657 n.21 (1984) ("[T]he
> appropriate inquiry focuses on the adversarial process, not on the accused's
> relationship with his lawyer as such[.]").

Soltero v. Kuhlman, 2000 WL 1781657, at *3 (S.D.N.Y. Dec. 4, 2000).

Rather, belated substitution of counsel is warranted only by "good cause, such as a

conflict of interest, a complete breakdown of communication or an irreconcilable conflict which

leads to an apparently unjust verdict."  McKee v. Harris, 649 F.2d 927, 931 (2d Cir. 1981)

(internal quotation marks and citations omitted), cert. denied, 456 U.S. 917 (1982); accord

Monegro v. Greiner, 2004 WL 187129, at *4 (S.D.N.Y. Jan. 28, 2004).  If the trial judge receives

"a seemingly substantial complaint" from a defendant about his counsel, the court has a duty to

28

"inquire into the reasons for dissatisfaction," McKee, 649 F.2d at 933, although any failure to

make such an inquiry is subject to harmless error analysis.  Norde v. Keane, 294 F.3d 401, 412

(2d Cir. 2002).

Greene moved for substitution of counsel on February 11, 2003, towards the beginning of

his suppression hearing, just two days before jury selection began.  His counsel, Bruno, informed

the trial court as follows: "My client, Mr. Greene, is rather adamant that I be relieved from the

case and that you assign new counsel.  He does not feel confident in my representing him."  (H.

Tr. 9-10).  The court inquired as to whether there was a basis other than the lack of confidence,

to which Greene's counsel responded: "No.  I mean, he feels that I'm not the attorney to

represent him.  He feels I have not expressed enough interest in his case."  (H. Tr. 10).  The

following colloquy ensued:

> MR. BRUNO: Anything you want to add?
> THE DEFENDANT: No -- you haven't really paid attention to my case, been
> talking about murder charges.
>     So, I mean, I really don't want to go to trial with him.
> MR. BRUNO: I'm not sure what he's talking about.
>     What murder charge?
> THE DEFENDANT: He's been interested in other cases.  I've been incarcerated
> for two years and haven't had a chance to speak to my attorney for more than five
> months.
> THE COURT: Mr. Greene, I reviewed the file before the case was called into the
> record and I'm aware that Mr. Bruno is the fourth attorney who has been assigned
> to represent you.
>     . . . Mr. Bruno is one of the most effective and zealous practitioners that
> has ever appeared before me. . . . I feel certain that if I were to grant your request
> and assign a new attorney, . . . some weeks or months from now, you'd be turning
> to me or whatever judge you were then before and saying, "You know, I really --
> I've had second thoughts.  I think Mr. Bruno would have been better for me."
>     Your assessment of Mr. Bruno's interest in this case is misplaced, is
> wrong. . . .
>     The law will not permit me to assign new counsel to represent you based
> on the information that you've now provided me, simply that you don't have
> confidence in Mr. Bruno.  You ought to have confidence in Mr. Bruno.  . . .

29

(H. Tr. 10-12).

On February 13th, Greene's counsel stated to the court as follows: "My client indicates he will not proceed to trial with me; . . . that if you won't assign a new attorney, he'd rather go pro se than have me defend him.  I think that's a very important issue."  See Tr. 57.  The court engaged in a detailed inquiry about whether Greene truly understood the risks of self-representation.  See Tr. 57-61.  Greene asked to speak, but the court did not permit him to speak, instead continuing its inquiry into the risks of self-representation.  See Tr. 59.  At the end, the court asked Greene: "Do you still wish to represent yourself?" to which Greene simply responded, "No, Your honor.  No."  See Tr. 61.  The court then told him, "any other point that you wish to make, you may make through counsel, Mr. Bruno."  Id.

The Appellate Division found that "the court properly denied defendant's request for new counsel."  Greene, 16 A.D.3d at 350.

The Second Circuit has instructed that "good cause" warranting the substitution of counsel is not to be determined "solely according to the subjective standard of what the defendant perceives.  While loss of trust is certainly a factor in assessing good cause, a defendant seeking substitution of assigned counsel must nevertheless afford the court with legitimate reasons for the lack of confidence."  McKee, 649 F.2d at 932.  Therefore, Greene's initial reason for requesting new counsel – that his attorney was paying insufficient attention to his case (see H. Tr. 10) – by itself was insufficient cause for substitution of counsel.

With respect to Bruno's statement on February 13th that Greene wanted new counsel, the trial court did not give Greene an additional opportunity to express his reasons.  However, that second request occurred on the next business day.  Given that the second request came just on

30

the heels of the first, it was reasonable for the court to believe that Greene had no new reasons to request new counsel.  Greene could have insisted on presenting reasons, or delivered them through his counsel,[5] which might have prompted a renewed duty to inquire.  That was not the case here, however.

In sum, since none of these reasons present an additional showing of good cause for a change in counsel, "such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict," McKee, 649 F.2d at 931, the Appellate Division reasonably concluded that the request for new counsel was properly denied. See Greene, 16 A.D.3d at 350.

E.  Remaining Claims

The five remaining claims relate to: (1) the trial court's statements during voir dire; (2) the court's alleged delegation of the discharge of a juror to a clerk; (3) the court's alleged "failure . . . to properly administer the statutory requirements for [Greene] to proceed pro se"; (4) the prosecution's statements during voir dire and (5) the prosecution's statements at summation.

The respondent contends that these claims are procedurally barred.  See Resp. Mem. at 23-24.  The Appellate Division's conclusion that these claims are "unpreserved," Greene, 16 A.D.3d at 350, is an obvious reference to N.Y.C.P.L. § 470.05(2), which codifies New York's contemporaneous objection rule.  Because the Court of Appeals denied Greene leave to appeal the Appellate Division's ruling, that ruling is the "last reasoned opinion" in this case.  See Ylst v.

---

[5]While the court was making its inquiry into self-representation, Greene was directed by the court:  "At this time, while I'm making [an] inquiry, you have no right to speak to me.  I would like my questions answered and, as long as Mr. Bruno is still your attorney, anything that you have to say should come to me through Mr. Bruno."  See Tr. 60.

Nunnemaker, 501 U.S. 797, 803 (1991) (where "the last reasoned opinion on the claim explicitly

imposes a procedural default, we will presume that a later decision rejecting the claim did not

silently disregard that bar and consider the merits").

      While the Appellate Division did not specifically state the basis for its holding that these

issues were not preserved, its statement was sufficient to show reliance on a procedural bar.  See,

e.g., Harris v. Reed, 489 U.S. 255, 265 n.12 (1989).  The fact that the Appellate Division

indicated that if it were to review this unpreserved claim on the merits it would reject it, Greene,

16 A.D.3d at 350, is of no significance.  The procedural default doctrine applies even where, as

here, the Appellate Division issued an alternative holding addressing the procedurally defaulted

claim on the merits.  Harris, 489 U.S. at 264 n.10.  Accordingly, the Appellate Division rejected

Greene's claim on an "independent" state law ground.

      The remaining question is "whether the state ground relied upon is 'adequate' to preclude

federal habeas review."  Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999).  "'[A] procedural bar

will be deemed adequate only if it is based on a rule that is firmly established and regularly

followed by the state in question,'" Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)

(quoting Cotto v. Herbert, 331 F.3d 217, 239 (2d Cir. 2003)), which is examined "in

consideration of the specific circumstances presented in a case."  Id.

      "Though a rule in general terms might be considered 'firmly established and regularly

followed,' such a rule considered in the specific circumstances of a case might be inadequate to

preclude federal habeas review."  Id.  The Second Circuit has set forth the following

"guideposts" for making this determination:

      (1) whether the alleged procedural violation was actually relied on in the trial
      court, and whether perfect compliance with the state rule would have changed the

32

trial court's decision; (2) whether state caselaw indicated that compliance with the
rule was demanded in the specific circumstances presented; and (3) whether
petitioner had "substantially complied" with the rule given "the realities of trial,"
and, therefore, whether demanding perfect compliance with the rule would serve a
legitimate governmental interest.

Id. at 242 (quoting Cotto v. Herbert, 331 F.3d at 240).

The first guidepost is not relevant to any of these claims because "the lack of objection
by a party would not, almost by definition, be mentioned by the trial court." Id. (internal
quotation marks omitted). In any event, the lack of objections were "relied upon" by the trial
court in the sense that, had proper objections been made, it would have allowed the trial court to
review and weigh Greene's claims.

The second and third guideposts must be evaluated in the "specific circumstances" of
each claim. Therefore, we next examine the second and third guideposts with respect to each
claim separately.

1. Voir Dire

Jury selection began on Thursday, February 13, 2003. (Tr. 50). After the initial panel of
perspective jurors was seated, the judge introduced himself and explained that jury service might
be inconvenient, but is part of the judicial system, and a civic duty. (Tr. 65-66). He followed
with this statement:

There is one other thing I would like you to consider as we start this jury
selection process. As all of you know, in September of 2001, a small group of
men hijacked four airplanes and flew them into buildings, killing thousands of
innocent people here and in Washington D.C. and in Western Pennsylvania.
I don't presume to understand all of the reasons those men hate us or why
they hate us with such rage and madness. I do feel certain, however, that one of
the things they hate about us is our system of justice. They hate the safeguards
that we've established to protect the rights of individuals. They don't trust
citizens, people like you, to make decisions about guilt or innocence because

those decisions might not be the right decisions so far as their leaders are
concerned.
　　　　Serving on a jury may not be the only way that you can speak back to the
terrorists, but I submit that it's one very good way to speak back to them.

(Tr. 66-67).  The oath was then administered to the panel of prospective jurors.  (Tr. 68).  By the

end of the day, 10 jurors had been chosen, all of whom eventually served on Greene's jury.  (Tr.

193, 256).  They were asked to return on Tuesday morning, February 18th, to start the trial.  (Tr.

192, 256).

The judge then directed the remaining prospective jurors to return the next day, Friday,

February 14.  (Tr. 256).  After their departure, Greene's counsel requested that court not be held

then because of jum'ah, the Friday Muslim prayer.  (Tr. 257-58).  It appears that Greene had

made numerous court appearances previously on Fridays (Tr. 261-62) and when asked why he

had not made this request prior to the judge's telling the jurors to return the next day, Greene

said that he assumed that court would not be held on that day because it was Valentine's Day.

(Tr. 260).

The next day, Friday, before the prospective jurors re-entered the courtroom, the parties

discussed what they should be told about Greene's absence, given that the judge had made

specific representations as to the trial schedule and the judge did not want to make himself "a

liar."  (Tr. 272).  Greene's counsel agreed that the prospective jurors should be told about

Greene's religious observance.  (Tr. 272-73).  The trial court thereupon told the prospective

jurors that it was adjourning the proceedings, indicating as the reason that "Mr. Greene's

religious beliefs prevent him from attending court today or subsequent Fridays during the course

of the trial."  (Tr. 277).  Because this moved the schedule back by a day, the judge's clerk called

the 10 selected jurors to delay their return until Tuesday afternoon.  (Tr. 270, 286-87).

Jury selection resumed on Tuesday, February 18th and continued into February 19th. (Tr. 284, 317).  As it turned out, all but one of the prospective jurors who were given the "religious beliefs" explanation for Greene's absence on Friday were peremptorily challenged. (Tr. 321).  Greene's counsel asked that the remaining prospective juror be excused on the ground that the prospective juror might have harbored some anti-Muslim bias.  (Tr. 321).  The prosecution and the court agreed to excuse the prospective juror.  (Tr. 321-22).  Noting that he had given an instruction that defense counsel had requested, the judge nonetheless promised to "studiously avoid making any such reference from this point on."  (Tr. 322).

A new panel of prospective jurors was brought in.  (Tr. 333).  The judge then made a statement to the new panel about September 11th that was almost identical to the previous one. (Tr. 334-35).  The two final jurors who served on Greene's jury were selected from this second pool.

In his brief to the Appellate Division, Greene argued that the trial judge's statement about the terrorism on September 11, 2001 violated his right to a fair trial.  See Supp. App. Mem. at 38-40.  He characterized the judge's statement as "inflammatory," with "no purpose but to rouse the emotion of the jury."  Id. at 38.  He contended that the September 11, 2001 terrorists were "funded by all manner of illegal activities" and his was a case where "more than a quarter-million dollars in cash and jewelry" were stolen.  Id. at 39.  Greene argued that "the jury could have . . . convicted [him] simply because he was Muslim, and that the robbery [could be seen as] an attempt to gain money for other illegal activities."  Id. at 40.

Counsel made no objection to the judge's statements regarding September 11th.  New York law, however, consistently requires a contemporaneous objection in order to preserve

appellate review of the claim of error.  See, e.g., People v. Jones, 2007 WL 1079938, at *1 (1st Dep't Apr. 12, 2007) ("[C]hallenges . . . to remarks made by the court and prosecutor during jury selection are likewise unpreserved and we decline to review them in the interest of justice."); People v. Farrell, 28 A.D.3d 244, 244-45 (1st Dep't 2006) ("Defendant's . . . challenges to the court's pre-voir dire instructions, are unpreserved and we decline to review them in the interest of justice."); People v. Lamagna, 30 A.D.3d 1052, 1053 (4th Dep't 2006) ("Defendant failed to preserve for our review his contention that County Court lacked authority to direct the prosecutor and defense counsel that they should not state the last names of the prospective jurors during voir dire and we decline to exercise our power to review that contention as a matter of discretion in the interest of justice") (citations omitted); People v. Cooper, 300 A.D.2d 4, 4 (1st Dep't 2002) ("[d]efendant's objections to the court's delivery, during voir dire, of an unrequested instruction to the jury to draw no adverse inference in the event that defendant chose not to testify, and to the expansive language of that charge, are objections requiring preservation").  Thus, the second Cotto guidepost is not met in this case.

The third guidepost, "whether petitioner had 'substantially complied' with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest," Monroe, 433 F.3d at 242, also does not help Greene. There was no compliance at all with the rule, let alone substantial compliance.  Thus, this claim is procedurally barred.

### 2.  Delegation of Judicial Tasks

Greene argued that the judge "delegated the duty to discharge a juror to his clerk," but was statutorily required to do this himself.  See Supp. App. Mem. at 40-41.  This claim also fails

to meet the second <u>Cotto</u> guidepost because New York law consistently requires a contemporaneous objection in these specific circumstances in order to preserve appellate review of the claim of error.  <u>See</u>, <u>e.g.</u>, <u>People v. Camacho</u>, 90 N.Y.2d 558, 560 (1997) ("Defendant's unpreserved contentions regarding the trial court's actions as to . . . a claimed delegation of responsibility to nonjudicial court personnel merit no consideration on the state of this record."); <u>People v. Ford</u>, 161 A.D.2d 262, 264 (1st Dep't 1990) ("Defendant's challenge to the court's delegation to the court officer of the task of informing the jury that they shortly would be taken to dinner and sequestered . . . is unpreserved for our review as a matter of law.") (citations omitted), <u>aff'd</u>, 78 N.Y.2d 878 (1991).

The third guidepost also does not help Greene because his counsel did not object at all to delegating the dismissal of the juror to his clerk.  In fact, Greene's counsel consented to the delegation.  <u>See</u> Tr. 513-14.  Therefore, Greene cannot show that he "substantially complied" with the state rule.

### 3. <u>Proceeding Pro Se</u>

Greene's petition for habeas corpus asserts that "the lower court's . . . failure . . . to properly administer the statutory requirements for petitioner to proceed pro-se, denied him of a fair trial and of due process."  Petition at 4.  It is unclear, however, what error Greene is asserting occurred in the trial court.  In his appellate brief, Greene had argued that he had wanted either new counsel or to proceed <u>pro se</u>.  <u>See</u> Supp. App. Mem. at 32.  The specific errors he alleged turn on the colloquy he had with the court, arguing that the court "excessively warn[ed] [him] about the dangers of proceeding pro-se," and refused to hear his explanation as to why he wanted to proceed <u>pro se</u>.  <u>See id.</u>

It is not necessary to reach the procedural bar as to this claim since it fails on the merits. The Supreme Court has directed that a defendant wishing to proceed pro se "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" Faretta v. California, 422 U.S. 806, 835 (1975) (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1942)).  The trial judge complied with this directive and thus there was no error.

### 4.  Prosecution's Statements During Voir Dire

Greene next objected to the prosecutor's statements during voir dire.  See Petition at 4. In the Appellate Division, Greene contended that, during voir dire, "[t]he prosecutor alluded to the panel that there was a racist cop involved in this trial."  See Supp. App. Mem. at 50.  "She did this," he maintained, "in order to gauge the larg[e]ly minority panel's response to the police, and to target minorities for elimination from the jury . . . ."  Id.  Greene argued that "[t]his was, in essence," a Batson violation.  Id.

During voir dire, the prosecutor asked the prospective jurors:

> Is there anybody here who feels that they have some bias or they automatically feel suspicious when they hear that an officer is gonna testify and they don't want to or don't feel that they could be a fair juror on a case where a police officer would give testimony?  Anybody?
> Well, we've all heard about some officers in the news over the past few years who maybe were not good officers, correct?  Or maybe even racist, right?

Tr. 149.  She then asked one particular juror, "What if this police officer testifies and you get a feeling in your gut or wherever that he's racist . . . but you don't have a problem with the way he made the arrest or the fact, you know, whatever it was that made him arrest Mr. Greene?"  Tr. 151-52.  The prosecutor later asked individual prospective jurors from the second panel similar questions about racist police officers: "if you . . . got a racist vibe from the detective who's

38

gonna testify in this case," Tr. 221; "if you . . . got like a racist vibe or something from that cop,

you kind of would tune [him] out," Tr. 222; "what's important [is] whether or not Mr. Greene is

guilty of robbery, not if the cop is a racist or not, right?"  Tr. 223.

No objection was made to these comments.  The law is clear that "a party must raise his

or her Batson challenges in a manner that would allow a trial court to remedy the problem at

trial."  Galarza v. Keane, 252 F.3d 630, 638 (2d Cir. 2001).  As a result, the Second Circuit has

found that failure to contemporaneously preserve a Batson claim qualifies as an independent and

adequate state ground to bar habeas review.  Rodriguez v. Schriver, 392 F.3d 505, 510 (2d Cir.

2004).  To the extent that the questions are viewed as representing an improper inquiry by the

prosecutor, the Appellate Division properly found them to be unpreserved for the same reasons

discussed in section III.E.1 above.

### 5.  Prosecution's Statements in Summation

Included in the prosecutor's summation were the following statements:

> Defense counsel . . . tried to make it seem as if Mr. Malik was lying about
> something when I showed him People's 14D, and I asked him, who do you think -
> - who do you see on that, and he said, I see Chance.  Now, I submit that the
> person pushing Chance or Dunbar is Reginald Greene, the UPS person, but you
> know something?  These people swore to tell the truth, and I submit that he didn't
> want to tell you something that he didn't firmly believe.

(Tr. 1027-28).

> I mean, imagine how terrifying it must have been.  . . . Then think about Mr.
> Ahmad, because he's there [in the bathroom] with his friends . . . .  You think at
> that point he's not practically peeing on himself because he's being selected to
> come out . . . .  How does he know that the robber isn't just some crazy lunatic
> who's going to shoot him for fun?  We read about it in the papers all the time.

(Tr. 1029-30).

> Mr. Greene didn't just get himself buzzed in, I submit, and stand aside and let the other two guys rob the store.  He's busy pushing Dunbar around.  Whether it's for show or it's real, doesn't really matter.

(Tr. 1036).

> I think Dunbar was a dupe.  I think he was put there and he was armed with nothing, but I don't think he was in on it.  That's my opinion and you are free to reject it.

(Tr. 1038).

> Is it any wonder that Mr. Dunbar fled?  He either knows these guys and he's really angry that he got beaten up and put there and he wants no part of this . . . .

(Tr. 1041).

> You now have all the proof that you need, I submit, to find Mr. Greene guilty beyond a reasonable doubt.  You can find him guilty on a combination of the complainants' testimony and the videotape, but even if for some reason you choose to reject what the complainants say, although I personally believe that you can find them credible and that their IDs are reliable in court two years later and at the lineup, that the videotape and the still photographs taken from the tape prove that he's in the store and you see from the tape that he does.

(Tr. 1045).

Greene's final claim is that these statements in the prosecution's summation violated his

constitutional rights.  See Petition at 4; Supp. App. Mem. at 45-50.

Of the six statements that Greene now complains about, counsel did not object to three of

them.  See Tr. 1036, 1038, 1045.  With respect to these, New York courts have regularly held

that the failure to object during summations is a procedural bar.  See, e.g., People v. Harris, 98

N.Y.2d 452, 492 n.18 (2002); People v. Scott, 267 A.D.2d 259, 260 (2d Dep't 1999); People v.

Morris, 246 A.D.2d 559, 559 (2d Dep't 1998); People v. Richard, 229 A.D.2d 787, 789 (3d

Dep't 1996).  In addition, the Second Circuit has specifically held that the failure to object to the

prosecutor's remarks in summation is an independent and adequate state ground precluding

habeas relief.  See Vargas v. Keene, 86 F.3d 1273, 1280 (2d Cir.), cert. denied, 519 U.S. 895 (1996).

    As for the three statements with respect to which objection was made, the trial court sustained the objections as to two of them.  See Tr. 1030, 1041.  In order to properly preserve the sustained objections as claims for appellate review, however, Greene's counsel was required under New York law to "request[] further relief from the trial court."  Madore v. Beaver, 368 F. Supp. 2d 219, 223 (W.D.N.Y. 2005) (citing People v. Medina, 53 N.Y.2d 951, 953 (1981)). Further relief would include a request for curative instructions or a motion for a mistrial.  See, e.g., People v. Morel, 297 A.D.2d 757, 757 (2d Dep't 2002) ("[s]ince the defendant . . . did not ask for curative instructions or move for a mistrial based on the sustained objections, his claims of alleged improprieties in the prosecutor's cross-examination of him and in summation are unpreserved for appellate review").  Here, no such requests were made, however.  Thus, there was no preservation under New York law.

    Greene argued that even where there has been no contemporaneous objection, New York courts will "review pervasive patterns of misconduct by the prosecutor during summation."  See Supp. App. Mem. at 45, 50 (citing People v. Skinner, 298 A.D.2d 625 (3d Dep't 2002)).  In Skinner, the court reversed on the basis of the prosecutor's improper remarks during summation, even though the issue was unpreserved for review.  Skinner, 298 A.D.2d at 626.  That court stated:

> Considering the severity and frequency of the improprieties throughout the summation in which the prosecutor made at least a dozen direct references to defendant being a liar, made other references to defendant's "false" and/or "tailored story" and denigrated the defense expert by characterizing him as a puppeteer with defendant as his puppet, a new trial is warranted.  In short, the

41

> misconduct was so flagrant and pervasive as to compel the conclusion that
> defendant was deprived of a fair trial.

Id. at 626-27 (internal citations omitted).  Because there were not such severe and frequent

improper statements here, we cannot say that preservation is not demanded in these specific

circumstances.  Therefore, the second Cotto guidepost fails to help Greene.

The third guidepost does not help Greene either, since Greene failed to make proper

objections in these situations.  In other words, Greene cannot show that he "substantially

complied" with the state rule requiring him to preserve his objections for appellate review.

The statement with respect to which an objection was made and overruled was the

following statement:  "These people swore to tell the truth, and I submit that he didn't want to

tell you something that he didn't firmly believe."  Tr. 1027-28.  The respondent urges that,

viewed in the right context, this was not vouching but a proper response to Greene's counsel's

summation.  See Resp. Mem. at 29-30.

> Prior to the prosecutor making this statement, Greene's counsel had argued:

> [S]he, the prosecutor, offers Exhibit 14 which is a board with a number of shots
> which . . . includes shots of Mr. Greene, and yet what is the one reaction, the one
> response elicited from Malik?  Well, that picture D looks like Chance.  In other
> words, he can't select the alleged Mr. Greene from a collection of photos in front
> of his face, but he will have you believe that in a lineup he can pick him out.

Tr. 992-93.  The prosecutor then included these comments in her own summation:

> Defense counsel . . . tried to make it seem as if Mr. Malik was lying about
> something when I showed him People's 14D, and I asked him, who do you think -
> - who do you see on that, and he said, I see Chance.  Now, I submit that the
> person pushing Chance or Dunbar is Reginald Greene, the UPS person, but you
> know something?  These people swore to tell the truth, and I submit that he didn't
> want to tell you something that he didn't firmly believe.

Tr. 1027-28.  Viewed in context, these comments are an acceptable response to Greene's

counsel's commenting on the credibility of Malik.  See, e.g., Ayala v. Ercole, 2007 WL

1135560, at *17 (E.D.N.Y. Apr. 17, 2007) ("[A] prosecutor is permitted to respond in an

appropriate manner to attacks on the government's case by defense counsel during his

summation, including attacks on the credibility of government witnesses.") (collecting cases);

Everett v. Fischer, 2002 WL 1447487, at *3 (E.D.N.Y. July 3, 2002) (prosecutor's comments as

to the credibility of government witnesses a "fair response" to defense counsel's attack on the

credibility of those witnesses); see also Shariff v. Artuz, 2001 WL 135763, at *8 (S.D.N.Y. Feb.

16, 2001) ("Although the government may not vouch for a witness's credibility, it may respond

to an argument that impugns the government's integrity or the integrity of the case."); Ramos v.

Keane, 1994 WL 97080, at *4 (S.D.N.Y. Mar. 23, 1994) ("[A] prosecutor may present what . . .

amounts to a boisterous argument if it is specifically done in rebuttal to assertions made by

defense counsel in order to remove any stigma cast upon the government or its witnesses.")

(internal quotation marks and citation omitted).  Thus, the comments do not provide a basis for

habeas relief.

> Even if the comments were improper,
>
> A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone in an otherwise fair proceeding.  In order to reach the level of a constitutional violation, a prosecutor's remarks must "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process. Prosecutorial misconduct during summation is grounds for reversal only when the remarks caused "substantial prejudice" to the defendant.

Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991) (internal citations and quotations

omitted).  The prosecutor's comments, when viewed in the context of the entire summation and

the other evidence at trial, did not meet this exacting standard.

6. <u>Summary</u>

As just discussed, some of Greene's remaining claims should be denied on the merits.  To the extent we have upheld a procedural bar relied upon by the Appellate Division, the bar was one that is "firmly established and regularly followed," and thus constitutes an adequate state ground barring review of the merits of all Greene's claims.  With respect to such claims, habeas review of Greene's claims is unavailable unless he can establish cause for his default and resulting prejudice or can demonstrate that he is "actually innocent."  <u>See</u>, <u>e.g.</u>, <u>St. Helen v. Senkowski</u>, 374 F.3d 181, 183-84 (2d Cir. 2004), <u>cert. denied</u>, 543 U.S. 1058 (2005).  Even construing his <u>pro se</u> petition liberally, <u>see</u> <u>Williams v. Kullman</u>, 722 F.2d 1048, 1050-51 (2d Cir. 1983), Greene has made no such showing with respect to the claims in his petition. Therefore, these claims may not be considered on federal habeas review.

<u>Conclusion</u>

The petition for habeas corpus should be denied.

**<u>PROCEDURE FOR FILING OBJECTIONS TO THIS</u>**
**<u>REPORT AND RECOMMENDATION</u>**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections.  <u>See also</u> Fed. R. Civ. P. 6(a), (e).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Loretta A. Preska, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Preska.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

44

Dated: June 4, 2007
         New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Reginald Greene
03-A-2316
Eastern NY Correctional Facility
P.O. Box 338
Napanoch, NY 12458

T. Charles Won
Assistant District Attorney
198 East 161 Street
Bronx, NY 10451

Hon. Loretta A. Preska
United States District Judge

Dated: June 4, 2007
    New York, New York

GABRIEL W, GORENSTEIN
United States Magistrate Judge

Copies sent to:

Reginald Greene
03-A-2316
Eastern NY Correctional Facility
P.O. Box 338
Napanoch, NY 12458

T. Charles Won
Assistant District Attorney
198 East 161 Street
Bronx, NY 10451

Hon. Loretta A. Preska
United States District Judge

45